**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILIP IRMINGER, derivatively on behalf of WHEELS UP EXPERIENCE INC., | |
| Plaintiff, | Case No.: 1:23-cv-6777 |
| vs. | |
| KENNETH DICHTER, TODD SMITH, DAVID ADELMAN, TIMOTHY ARMSTRONG, CHIH CHEUNG, MARC FARRELL, DWIGHT JAMES, BRIAN RADECKI, SUSAN SCHUMAN, ERIK SNELL, and RAVI THAKRAN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| WHEELS UP EXPERIENCE INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Philip Irminger ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Wheels Up Experience Inc. ("Wheels Up" or the "Company"), files this Verified Shareholder Derivative Complaint against Kenneth Dichter ("Dichter"), Todd Smith ("Smith"), David Adelman ("Adelman"), Timothy Armstrong ("Armstrong"), Chih Cheung ("Cheung"), Marc Farrell ("Farrell"), Dwight James ("James"), Brian Radecki ("Radecki"), Susan Schuman ("Schuman"), Erik Snell ("Snell"), and Ravi Thakran ("Thakran") (collectively, the "Individual Defendants," and together with Wheels Up, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Wheels Up,

1

unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wheels Up, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Wheels Up's directors and officers from November 9, 2022 until March 31, 2023 (the "Relevant Period") in connection with the issuance of false and misleading statements, including in the Company's SEC filings, and regarding the Company's inadequate internal controls over its financial reporting, among other things.

2.      Wheels Up, founded in 2013, is a Delaware corporation, based in New York, New York, that provides on-demand private aviation services throughout the United States. The Company offers membership programs, charter, aircraft management services, and aircraft sales. Wheels Up also offers freight, safety, and security solutions and management services to private individuals, industry, civil, and government entities.

3.      Wheels Up entered a strategic partnership with Delta Airlines, Inc. ("Delta") in January 2020, which contemplates a close relationship between the companies, including the sharing of an annual joint marketing and communications plan that "focuses on mutual revenue and brand goals, influence/ambassador partnerships and co-branded event opportunities," among other things. The Wheels Up-Delta partnership further requires Wheels Up to purchase miles in Delta's SkyMiles Program, allows Wheels Up to purchase flight tickets at discounted rates from Delta, and encourages Delta to furnish certain Wheels Up executives and employees with Delta 360 and SkyMiles Medallion benefits.

4.      On July 13, 2021, Wheels Up completed a reverse merger with Aspirational Consumer Lifestyle Corporation ("Aspirational"), a blank check company founded and controlled by Defendant Thakran, whereby Wheels Up became a publicly traded company on the New York Stock Exchange ("NYSE"), trading under the ticker symbol "UP." The day after the merger, Wheels Up's common stock traded at $115.50 per share.

5.      On November 9, 2022, after the market closed, Wheels Up issued a press release entitled, "Wheels Up Announces Record Third Quarter Revenue Up 39% Year-over-Year." The press release announced the Company's third quarter of 2022 financial results, ending for the period on September 30, 2022 ("Q3 2022"). The press release was accompanied by the Company's filing of a Form 8-K with the SEC, wherein the Company reported a net loss of $86,838,000 for the three months ended September 30, 2022, and a net loss of $268,637,000 for the nine months ended September 30, 2022. Wheels Up further reported goodwill of $52,847,000 and an accumulated deficit of $988,964,000 for the period ended September 30, 2022.

6.      On the same day, November 9, 2022, Wheels Up filed its quarterly report on Form 10-Q for Q3 2022 with the SEC ("Q3 2022 10-Q"). Attached to the Q3 2022 10-Q were

certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dichter and Smith attesting to the accuracy of the Q3 2022 10-Q.

7.      The Q3 2022 10-Q reported the same net loss, goodwill, and accumulated deficit data as the press release and Form 8-K that were issued the same day. The Q3 2022 10-Q also did not identify any material weaknesses in Wheels Up's internal controls and procedures.

8.      On March 9, 2023, before the market opened, Wheels Up issued a press release entitled, "Wheels Up Announces Record Revenue for Fourth Quarter 2022." The press release announced the Company's fourth quarter of 2022 financial results, ending for the period on December 31, 2022 ("Q4 2022"). The press release was accompanied by the Company's filing of a Form 8-K with the SEC. The Company reported a net loss of $238,910,000 for the three months ended December 31, 2022, and a net loss of $507,547,000 for the twelve months ended December 31, 2022. Wheels Up further reported goodwill of $396,118,000 and an impairment of goodwill of $132,000,000 for the period ended December 31, 2022.

9.      Throughout the Relevant Period, Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company in its public disclosures and SEC filings. In particular, Defendants failed to disclose adverse information regarding the Company's business prospects and operations. These inadequate internal controls resulted in the Company's failure to comply with SEC rules and regulations, caused the Company to launch costly internal investigations with outside counsel and consultants which delayed the filing of several financial statements with the SEC, and eventually forced the Company to restate several financial statements filed with the SEC.

10.     Despite becoming aware of the Company's inadequate internal controls in mid-March 2023, Defendants concealed this reality from investors and the overall public and failed to take timely mitigative action, instead making a series of false and misleading statements touting the health of the Company, which suggested that the Company only faced routine internal controls challenges. Defendants did not begin to disclose the severity of the internal controls issue to investors or to the public until March 17, 2023, when Wheels Up, after the market closed, issued a Notification of Late Filing on Form 12b-25 which informed investors that the Company would be unable to timely file its annual report on Form 10-K with the SEC due to "unanticipated delays in compiling certain necessary information."

11.     On this news, the price per share of the Company's common stock fell $0.027, or 3.28%, from a closing price of $0.824 per share on March 17, 2023, to a closing price of $0.7970 per share on March 20, 2023, the next trading day. However, investors remained in the dark about the true state of the Company.

12.     On March 31, 2023, the truth fully emerged when the Company filed an 8-K/A with the SEC ("March 2023 8-K") that revealed Wheels Up had "a material weakness" in its internal controls over financial reporting. The March 2023 8-K also revealed that several of the Company's previously filed financial statements should no longer be relied upon and further announced a plan to address the material weaknesses in the Company's internal controls. Specifically, Wheels Up stated that goodwill impairment charges of $62.0 million should have been recognized for Q3 2022, $118.0 million for Q4 2022, and $180 million for the fiscal year ended December 31, 2022 ("Fiscal Year 2022").

13.     That same day, Wheels Up filed a restatement on Form 10-Q/A with the SEC (the "Restatement"). The Restatement included signed SOX certifications from Defendants Dichter

and Smith attesting to the accuracy of the Restatement. Notably, the Restatement admitted that Wheels Up's internal controls and procedures were not effective for the periods ending Q3 2022 and Q4 2022.

14.     That same day, Wheels Up filed its belated annual report on Form 10-K with the SEC (the "2022 10-K"), which included signed SOX certifications from Defendants Dichter and Smith attesting to the accuracy of the 2022 10-K. The 2022 10-K contained similar representations as the Restatement, revealing that Wheels Up's internal controls and procedures were not effective for the periods ending Q3 2022 and Q4 2022.

15.     On this news, the price per share of the Company's common stock fell $0.072, or 11.37%, from a closing price of $0.633 per share on March 31, 2023, to a closing price of $0.5610 per share on April 3, 2023, the next trading day.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the adequacy of the Company's internal controls over financial reporting. The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) certain financial statements were improperly reported and would need to be restated; (2) the Company's internal controls were inadequate; (3) the Company disregarded its internal controls shortcomings; (4) as a result, the Company's annual filings would be delayed in violation of NYSE listing requirements; (5) after the misconduct concluded, the Company's CEO and Chairman of the Board would leave his roles; (6)  as a result of the foregoing, the Company's public statements were false and misleading at all relevant times.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

18.     One of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider sales during the period when the Company's common stock was trading at artificially inflated prices, netting personal proceeds in excess of $283,000.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Interim CEO, and its former CEO and Chairman of the Board of Directors (the "Board") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the Interim CEO's, former CEO's, and former Chair of the Board's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiff Irminger

26.     Plaintiff Irminger is a current shareholder of Wheels Up. Plaintiff has continuously owned Wheels Up common stock since he purchased it on November 12, 2021.

### Nominal Defendant Wheels Up

27.     Wheels Up is a Delaware corporation with its principal executive offices at 601 West 26th Street, Suite 900, New York, New York, 10001. Wheels Up's shares trade on the NYSE under the ticker symbol "UP."

**Defendant Dichter**

28.     Defendant Dichter founded Wheels Up in 2013 and served as the Company's CEO and Chairman of the Board from its founding in 2013 until May 2023. He currently serves solely as a Company director since May 2023. According to the proxy statement that the Company filed with the SEC on April 19, 2023 (the "2023 Proxy Statement"), as of April 13, 2023, Defendant Dichter beneficially owned 20,068,285 shares, or 8%, of the total outstanding common stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Dichter owned approximately $106,562,593 worth of Wheels Up stock as of that date.

29.     For Fiscal Year 2022, Defendant Dichter received $8,650,754 in total compensation from the Company. This included $950,000 in salary, $5,211,800 in stock awards, $1,130,500 in non-equity incentive plan compensation, and $1,358,454 in all other compensation.

30.     The 2023 Proxy Statement stated the following about Defendant Dichter:

Mr. Dichter is the Founder of Wheels Up and has served as Chief Executive Officer and Chairman since its inception in 2013. In 2021, Wheels Up became the first publicly traded on-demand private aviation company on the New York Stock Exchange. Mr. Dichter is a renowned entrepreneur with expertise in aviation, branding, marketing, public relations and advertising. Regarded as a disruptor in private aviation, Mr. Dichter founded Marquis Jet in 2001 and pioneered the first-ever fractional jet card. He served as Chief Executive Officer and as Chairman of Marquis Jet and oversaw its sale to Warren Buffett's Berkshire Hathaway's NetJets in 2010. Mr. Dichter once again disrupted the industry in 2013 with Wheels Up. Through its membership business model and innovative digital platform, Wheels Up has increased the accessibility of private air travel for consumers. In 2020, Wheels Up partnered with Delta to acquire Delta Private Jets, creating one of the industry's largest owned and managed fleets of private aircraft and bringing Delta aboard as a significant Wheels Up stockholder. Mr. Dichter also co-founded Tequila Avion, an ultra-premium tequila brand which was acquired by Pernod Ricard in 2014; he is an original investor in Juice Press, an organic food and juice company with locations across the United States, and he co-founded Alphabet City, a sports marketing and music company that was sold to Robert Sillerman's SFX Entertainment in 1998.

A committed philanthropist, Mr. Dichter spearheaded Meals Up with Wheels Up partners and ambassadors in support of Feeding America, one of the largest hunger-relief organizations in the United States. Meals Up was created in 2020 at the onset of the global pandemic and since then has raise and inspired nearly 90 million meals for Americans struggling with food insecurity. Mr. Dichter received a Bachelor of Arts degree in Sociology from the University of Wisconsin-Madison, where he remains an active alumnus and supporter. In 2019, he partnered with the Office of Admissions and Recruitment to launch the Fly High Fund to support a more diverse student population by building student networks from around the country and encouraging them to attend the University.

We believe Mr. Dichter is well qualified to serve on the Board, because of his vast knowledge of the private aviation industry and his 20+ year track record in the aviation business. He is well known and respected for his vision to democratize private aviation, as well as developing the fractional jet card. A sought-after industry thought leader and speaker, Mr. Dichter has made regular public appearances to share his perspectives on aviation, leadership, entrepreneurship, consumer brands, innovation and customer experience.

**Defendant Smith**

31.     Defendant Smith has served as the Company's Interim CEO since May 2023 and as the Company's Chief Financial Officer ("CFO") since June 2022. According to 2023 Proxy Statement, as of April 13, 2023, Defendant Smith beneficially owned 410,256 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Smith owned approximately $2,178,459 worth of Wheels Up stock as of that date.

32.     For Fiscal Year 2022, Defendant Smith received $4,770,216 in total compensation from the Company. This included $280,865 in salary, $4,000,000 in stock awards, $442,750 in non-equity incentive plan compensation, and $46,600 in all other compensation.

33.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Smith made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|

| January 3, 2023 | 273,504 | $1.04 | $284,444 |

Thus, in total, before the fraud was exposed, he sold 273,504 shares of Company stock on inside information, for which he received approximately $284,444 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34.     The 2023 Proxy Statement stated the following about Defendant Smith:

> Mr. Smith has served as Wheels Up's Chief Financial Officer since June 2022. As Chief Financial Officer, Mr. Smith oversees the finance and accounting, investor relations and strategic corporate development functions, including treasury and mergers and acquisitions. From May 2018 to March 2022, Mr. Smith served as the Global Head of Financial Planning and Analysis of General Electric Company ("GE") and Chief Financial Officer for GE Corporate. From August 2016 to April 2018, he served as Chief Financial Officer of GE Gas Power System, from August 2013 to July 2016, he served as Chief Financial Officer of GE Capital International, and from March 2012 to August 2013, he served as Chief Financial Officer, GE Healthcare Life Sciences. Prior to such time served in various capacities at GE since 1997. Mr. Smith holds a Bachelor of Science, Business Administration from the University of Florida, Warrington College of Business.

**Defendant Adelman**

35.     Defendant Adelman has served as a Company director since October 2013. He also serves as a member of the Compensation Committee and as a member of the Nominating and ESG Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Adelman beneficially owned 2,226,740 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Adelman owned approximately $11,823,989 worth of Wheels Up stock as of that date.

36.     For Fiscal Year 2022, Defendant Adelman received $327,731 in total compensation from the Company. This included $95,000 in fees earned or paid in cash, $175,001 in stock awards, and $57,730 in all other compensation.

37.     The 2023 Proxy Statement stated the following about Defendant Adelman:

Mr. Adelman has served as a member of the Board since October 2013. Mr. Adelman is a Philadelphia-based entrepreneur and active private investor. He is the co-founder and has served as the Vice Chairman of FS Investments, a leading manager of alternative investment funds with $38 billion of assets under management since December 2007. Mr. Adelman has also served as the Chief Executive Officer of Campus Apartments, a Philadelphia-founded firm that he built into a national leader in student housing development and management, with more than $2 billion in assets under management across 17 states, since 1997. Mr. Adelman has also led Darco Capital as its founder since March 2007, which has made over 50 investments in the venture capital and private equity spaces across multiple disciplines like fintech, sports and media, life sciences, and consumer-facing brands. Mr. Adelman is also a partner in Harris Blitzer Sports and Entertainment, which owns the Philadelphia 76ers and the New Jersey Devils. Additionally, he has served as Co-Chair for the Jewish Federation of Greater Philadelphia since September 2020 and Vice Chair of University City District board of directors since September 1998, while also serving on the Penn Medicine Board of Trustees since September 2018. Mr. Adelman has served as a member of the board of directors of FS Credit Real Estate Income Trust since February 2019. He has previously served as a member of the board of directors of FS / KKR Capital Corp. from October 2007 to April 2018, FS / KKR Capital Corp. II from July 2011 to April 2018, FS Global Credit Opportunities Fund from January 2013 to 2018, and FS Energy & Power Fund from September 2010 to March 2018. Mr. Adelman is a past recipient of the "Entrepreneur of the Year" award from Ernst & Young in the real estate category for Greater Philadelphia and is a member of the Real Estate Roundtable and Young Presidents' Organization. He received his Bachelor of Arts degree in Political Science from Ohio State University.

We believe Mr. Adelman is well qualified to serve on the Board due to his entrepreneurial success, his extensive investment experience, as well as his service as a member of the Board since it was founded and numerous other companies.

**Defendant Armstrong**

38.     Defendant Armstrong has served as a Company director since April 2019. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Armstrong beneficially owned 1,200,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Armstrong owned approximately $6,375,967 worth of Wheels Up stock as of that date.

39.     For Fiscal Year 2022, Defendant Armstrong received $265,178 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, $175,001 in stock awards, and $40,177 in all other compensation.

40.     The 2023 Proxy Statement stated the following about Defendant Armstrong:

> Mr. Armstrong has served as a member of the Board since April 2019. Mr. Armstrong is Founder and Chief Executive Officer of the Flowcode/dtx company, a direct-to-consumer enablement company he established in February 2019. From March 2009 to September 2018, Mr. Armstrong served as the Chair and Chief Executive Officer of AOL as well as the Chief Executive Officer of Oath (Verizon's media brand portfolio, which included Yahoo! and AOL) after Verizon's acquisition of AOL in May 2015. From 2000 to 2009, Mr. Armstrong served as President, Americas Operations and Senior Vice President of Google Inc. Before joining Google, Mr. Armstrong served as Vice President of Sales and Strategic Partnerships for Snowball.com and as Director of Integrated Sales and Marketing at Starwave's and Disney's ABC/ESPN Internet Ventures. Mr. Armstrong also has served on the board of directors of Booking Holdings (NASDAQ: BKNG) since January 2013 and of BrandFolder, Inc., a digital asset management and brand management software company, since March 2019. Mr. Armstrong is the Chair of Trustees at Greenwich Academy and also serves as a trustee of the USA Olympic and Para-Olympic Foundation. Mr. Armstrong holds Bachelor's degrees in Economics and Sociology from Connecticut College.

> We believe Mr. Armstrong is well qualified to serve on the Board due to his extensive executive leadership experience, his expertise with respect to marketing and sales, particularly with digital/online products, as well as his prior service as a member of executive leadership teams and/or boards of directors of public companies, along with his service as a member of the Board since 2019.

**Defendant Cheung**

41.     Defendant Cheung has served as a Company director since April 2016. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Cheung beneficially owned 230,076 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Cheung owned approximately $1,221,704 worth of Wheels Up stock as of that date.

42.    For Fiscal Year 2022, Defendant Cheung received $289,204 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, $175,001 in stock awards, and $64,203 in all other compensation.

43.    The 2023 Proxy Statement stated the following about Defendant Cheung:

Mr. Cheung has served as a member of the Board since April 2016. He is a Founding Managing Partner of SLP (SEA Logistic Partners), an industrial and logistic facility development and fund management platform with a focus on Vietnam that is a subsidiary of GLP Capital Partners (GCP), a leading global alternative asset manager with strong leadership in high-growth Asian markets and a track record of success at scale in the US, Brazil and Europe. He has been in this role since June 2020. Mr. Cheung is also the managing partner of C2 Capital Limited, a family office focused on investments in consumer brands and health and wellness companies, serving since February 2009. Previously, Mr. Cheung was the co-founder and co-chairman of JAMM Active Limited from September 2015 to December 2021, and the non-executive chairman of RSI Apparel (China) Limited from March 2005 to December 2015, the non-executive chairman of Yucheng Technologies Limited (now known as Yusys Technologies Co, Ltd.) from December 2005 to February 2009, and the managing partner of Staples Asia Investments Limited from September 2004 to March 2009. He is also a former member of the board of directors of Li & Fung Limited, where he served July 2017 to May 2020, and The Taiwan Fund, Inc., where he served from April 2015 to May 2016. Mr. Cheung holds a Juris Doctor degree from Harvard Law School, a Master of Business Administration degree from Harvard Business School and a Master of Arts degree and a Bachelor of Arts degree from Harvard University.

We believe Mr. Cheung is well qualified to serve on the Board due to his extensive international business experience, which includes retailing, logistics and operations, as well as his service as a member of the Board since 2016.

**Defendant Farrell**

44.    Defendant Farrell has served as a Company director since July 2021. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Farrell beneficially owned 80,450 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Farrell owned approximately $427,190 worth of Wheels Up stock as of that date.

45.     For Fiscal Year 2022, Defendant Farrell received $225,001 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $175,001 in stock awards.

46.     The 2023 Proxy Statement stated the following about Defendant Farrell:

Mr. Farrell has served as a member of the Board since July 2021. Mr. Farrell is the founder of Ten To One Rum and has served as its Chief Executive Officer since January 2019. Prior to launching Ten To One Rum, Mr. Farrell held a number of roles at Starbucks, serving as Vice President, E-Commerce Starbucks & Teavana from February 2016 to October 2016, Vice President, U.S. Retail Lobby and E-Commerce from October 2016 to January 2018, and Vice President, Global Retail and Beverage Innovation from January 2018 to October 2018. Mr. Farrell holds a Bachelor of Science degree from Massachusetts Institute of Technology, a Master of Philosophy degree from Cambridge University, and a Master of Business Administration degree from Harvard Business School.

We believe Mr. Farrell is well qualified to serve on the Board due to his consumer brand experience and, in particular, the development and implementation of e-commerce strategies, as well as the perspective he brings as an entrepreneur.

**Defendant James**

47.     Defendant James has served as a Company director since February 2022. Defendant James is one of two directors on the Board who was appointed by Delta. His primary occupation, for Delta, is Senior Vice President—Customer Engagement and Loyalty. He also serves as a member of the Safety and Security Committee.

48.     The 2023 Proxy Statement stated the following about Defendant James:

Mr. James has served as a member of the Board since February 2022. Mr. James serves as the Senior Vice President—Customer Engagement & Loyalty for Delta Air Lines, and Chief Executive Officer of Delta Vacations, responsible for the airline's SkyMiles loyalty program, Delta Sky Clubs, and industry-leading partnerships. As Chief Executive Officer of Delta Vacations, Mr. James leads the international Delta subsidiary, which specializes in curated vacation packages and experiences. Since 2009, he has held several senior executive roles at Delta, which include SVP—Pricing and Revenue Management, where he oversaw the development, planning and execution of revenue generation strategies, product strategy, and commercial delivery for Delta, as well as commercial systems development and corporate revenue forecasting. Mr. James also served as Delta's

SVP,—International Pricing and Revenue Management, in which he was responsible for the company's international revenue and profit performance. As an expatriate based in Amsterdam, Netherlands, Mr. James led the profit and loss statement of Delta's Europe, Middle East, Africa and India portfolio. Mr. James also served as the company's Chief Economist and Revenue Forecaster after beginning his career at Delta as an executive in the Corporate Strategy group. Prior to Delta, Mr. James was a Managing Partner with James-Lewis, a management consulting and principal investment firm, and spent several years with The Home Depot in various roles, including Corporate Strategy, Finance-Mergers & Acquisitions and as a senior commercial executive within a Home Depot national subsidiary. Mr. James serves on the Advisory Board Council of Cool Girls, Inc., and previously served on the Board of Directors of Boys & Girls Club of Metro Atlanta. Mr. James also serves on the Board of Directors of Floor & Décor Holdings, Inc. (NYSE: FND), a leading multi-channel specialty retailer of hard surface flooring and related accessories. Mr. James earned his Bachelor of Arts degree in Business Administration from Morehouse College and MBA from Duke University–The Fuqua School of Business.

We believe Mr. James is qualified to serve on the Board of Directors based on his leadership experience, which included overseeing digital strategies, customer loyalty and engagement, and strategic growth.

### Defendant Snell

49.     Defendant Snell has served as a Company director since November 2020. Defendant Snell is one of two directors on the Board who was appointed by Delta. His primary occupation, for Delta, is Senior Vice President—Airport Customer Service, Cargo Ops, Global Clean and GSE. He also serves as a member of the Safety and Security Committee.

50.     The 2023 Proxy Statement stated the following about Defendant Snell:

Mr. Snell has served as a member of the Board since July 2021. Mr. Snell currently serves as Senior Vice President—Airport Customer Service, Cargo Ops, Global Clean and GSE for Delta. Mr. Snell is responsible for Delta's largest frontline operating team. Mr. Snell is also responsible for the direction of airport operations worldwide, including all safety, baggage handling, ramp functions, customer service, on-time performance, aircraft cleanliness, Cargo operations and Ground Service Equipment, supporting approximately 32,000 people across the globe. Mr. Snell previously served as Senior Vice President—Operations & Customer Center (OCC), Operations Analytics and Subsidiary Airlines for Delta. In that role, Mr. Snell was responsible for the OCC and the direction of Delta's worldwide flight operations. Mr. Snell's responsibilities included oversight of the airline's Operations Analysis & Performance (OAP) and Operations Decision Science (ODS)

organizations, which seek to improve Delta's operations and customer service performance through data-focused analysis, decision making and tools. In addition, Mr. Snell was responsible for the Delta Connection portfolio of three regional airlines, including one wholly-owned subsidiary of Delta, Endeavor Air. Mr. Snell joined Delta in 2005 working in the airline's finance department. He has since held numerous positions across the finance and operations divisions, including serving as Vice President of Delta Connection from December 2015 through March 2017, Vice President—OCC from April 2017 through August 2018 and as a Senior Vice President in operations since September 2018. Mr. Snell also previously held the roles of President of Delta Global Services and Delta Private Jets, LLC ("DPJ"). Prior to Delta, Mr. Snell managed investment portfolios for individual clients at SunTrust Bank in Atlanta. Mr. Snell holds a Bachelor of Arts degree in Economics from Elon University and a Master of Business Administration degree in Finance from Emory University.

We believe Mr. Snell is well qualified to serve on the Board due to his substantial experience managing operations for a global airline as well as his prior service as President of DPJ.

**Defendant Radecki**

51.     Defendant Radecki has served as a Company director since January 2017. He also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Radecki beneficially owned 360,128 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Radecki owned approximately $1,912,280 worth of Wheels Up stock as of that date.

52.     For Fiscal Year 2022, Defendant Radecki received $391,397 in total compensation from the Company. This included $65,000 in fees earned or paid in cash, $175,001 in stock awards, and $151,396 in all other compensation.

53.     The 2023 Proxy Statement stated the following about Defendant Radecki:

Mr. Radecki has served as a member of the Board since January 2017. Mr. Radecki currently serves as the Founder, Chief Executive Officer and member of the board of directors of Rapa Therapeutics, a clinical stage start-up biotechnology company spun out of the National Cancer Institute in September 2017. Mr. Radecki is also an active angel investor, with investments across several industries in companies at various stages of the corporate lifecycle. In addition, Mr. Radecki has been an

investor and member of the board of directors of ACV Auctions Inc. (NASDAQ: ACVA) since February 2021. Mr. Radecki also currently serves on the board of directors of Rosecliff Acquisition Corp I (NASDAQ: RCLF) after joining its board of directors in February 2021. From 1997 to 2016, Mr. Radecki held various senior operational and financial roles at CoStar Group Inc. (CoStar) (NASDAQ: CSGP) including serving as its Chief Financial Officer from 2007 to 2016. While at CoStar, Mr. Radecki helped lead the company's initial public offering in 1998, along with subsequent equity offerings and several acquisitions. Prior to joining CoStar, Mr. Radecki served as Accounting Manager at Axent Technologies, Inc. Earlier in his career, Mr. Radecki worked at Azerty, Inc. and the public accounting firm, Lumsden & McCormick, LLP, both based in Buffalo, New York. Mr. Radecki received a Bachelor of Science degree in Business Administration and a dual degree in both Accounting and Finance from the State University of New York at Buffalo. We believe Mr. Radecki is well qualified to serve on the Board due to his extensive experience working at public companies in senior level roles, serving as a member of several boards of directors, including with Wheels Up since 2017, along with his substantial investment and advisory experience as a private angel investor.

**Defendant Schuman**

54.     Defendant Schuman has served as a Company director since July 2021. She also serves as a member of the Audit Committee and as a member of the Nominating and ESG Committee. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Schuman beneficially owned 106,347 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Schuman owned approximately $564,703 worth of Wheels Up stock as of that date.

55.     For Fiscal Year 2022, Defendant Schuman received $245,865 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, $175,001 in stock awards, and $20,864 in all other compensation.

56.     The 2023 Proxy Statement stated the following about Defendant Schuman:

Ms. Schuman has served as a member of the Board since July 2021. Ms. Schuman previously served as a board observer to the Board beginning in April 2020. Ms. Schuman is the Executive Chair and Co-Founder of SYPartners LLC ("SYPartners"), a consultancy firm that partners with chief executive officers and their leadership teams undergoing business and cultural transformation, serving as its Chief Executive Officer from October 2000 to January 2020, and as its

Executive Chair since January 2020. Ms. Schuman has also served as a founder and Vice Chair of the kyu Collective since January 2020. Prior to SYPartners, Ms. Schuman was the General Manager of Studio Archetype, one of the first premier web design firms in the U.S. Prior, she spent 7 years at Apple Computer where she was Group Manager of Worldwide Product Marketing. Ms. Schuman has served on the board of directors of Paramount Global (NASDAQ: PARA, formerly ViacomCBS Inc. and CBS) since September 2018 and the board of advisors of Godfrey Dadich Partners. Formerly she served on the board of advisors to IDEO from 2018 to 2022. Ms. Schuman received a Bachelor of Arts degree in Sociology and a minor in Art Therapy from the State University of New York at Buffalo.

We believe Ms. Schuman is well qualified to serve on the Board due to her experience working with executives at many high-profile companies and organizations to advise on business, organizational and cultural transformations, including new value creation strategies.

**Defendant Thakran**

57.    Defendant Thakran has served as a Company director since July 2021. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Thakran beneficially owned 3,162,789 shares of the Company's common stock, or 1.3%, of the Company's total outstanding stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Thakran owned approximately $16,794,410 worth of Wheels Up stock as of that date.

58.    For Fiscal Year 2022, Defendant Thakran received $243,396 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, $175,001 in stock awards, and $18,395 in all other compensation.

59.    The 2023 Proxy Statement stated the following about Defendant Thakran:

Mr. Thakran has served as a member of the Board since July 2021. Mr. Thakran also served as the Chief Executive Officer and the Chairman of the board of directors of Aspirational from July 2020 until the closing of the Business Combination in July 2021. Since June 2020, Mr. Thakran has served as Founder, Chairman and Managing Partner of Turmeric Capital, a private equity firm and specialist asset manager based in Singapore, with advisory offices in Mumbai and Abu Dhabi. Turmeric Capital focuses on the consumer and consumer technology

sectors, and targets high-growth companies, brands and technology platforms across Asia and Middle Eastern markets. Previously, Mr. Thakran was the Group Chairman of LVMH South and Southeast Asia and Australia/New Zealand from September 2001 to October 2020, which represented a portfolio of over 75 brands across multiple categories including wine and spirits, fashion and leather goods, perfumes and cosmetics, and watches and jewelry. In 2009, Mr. Thakran founded L Capital Asia, the Asian private equity venture of LVMH. L Capital (including L Capital Asia) merged with Catterton in 2016 to form L Catterton. Prior to joining LVMH, Mr. Thakran held senior management positions at the Swatch Group, Nike and Tata Group, based in various global locations. Mr. Thakran currently serves as Chairman of the Board of Directors of R.M. Williams, an Australian luxury footwear and apparel brand. He also previously served as a director on numerous public company boards, including SECOO China (Nasdaq: SECO), Future Lifestyle Fashions (NSE: FLFL), Mulsanne Group (HKSE: 1817), PVR Cinemas Ltd (NSE: PVR) and Clio Cosmetics Co Ltd (KOSDAQ: 237880). Mr. Thakran also currently serves as a director on numerous private company boards, including Arcadia s.r.l. (owner of Dondup brand) and CE LA VI. Mr. Thakran holds an MBA from the India Institute of Management, Ahmedabad.

We believe Mr. Thakran is well qualified to serve on the Board due to his extensive leadership and investing experience in the aspirational and luxury goods industry.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

60.      By reason of their positions as officers, directors, and/or fiduciaries of Wheels Up and because of their ability to control the business and corporate affairs of Wheels Up, the Individual Defendants owed Wheels Up and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wheels Up in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wheels Up and its shareholders so as to benefit all shareholders equally.

61.      Each director and officer of the Company owes to Wheels Up and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wheels Up, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of Wheels Up were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wheels Up, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Wheels Up's Board at all relevant times.

65.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

66.     To discharge their duties, the officers and directors of Wheels Up were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Wheels Up were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Wheels Up's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Wheels Up conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Wheels Up and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wheels Up's operations would comply with all applicable laws and Wheels Up's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.      Each of the Individual Defendants further owed to Wheels Up and the shareholders the duty of loyalty requiring that each favor Wheels Up's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Wheels Up and were at all times acting within the course and scope of such agency.

69.      Because of their advisory, executive, managerial, directorial, and controlling positions with Wheels Up, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wheels Up.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Wheels Up was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wheels Up, and was at all times acting within the course and scope of such agency.

## WHEELS UP'S CODE OF CONDUCT

76.     Wheels Up's Code of Conduct provides that the Company "strive[s] to conduct their business according to the highest ethical standards and integrity. We expect our officers, directors, employees and contractors to conduct themselves and their business activities in accordance with these standards." The Code of Conduct states further that "[c]orporate officers (including the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions), directors, employees and contractors (together or referred to in this Code, collectively or individually, as "Personnel") must act lawfully, ethically and honestly in all dealings with Wheels Up's members, clients, vendors, suppliers and others who provide services to or transact business with Wheels Up ."

77.     In a section titled "Compliance with Laws," the Code of Conduct states that it is "your duty to comply fully with all applicable laws, rules and regulations in cities, states, and countries in which Wheels Up operates."

78.     In a section titled "Insider Trading," the Code of Conduct states the following, in relevant part:

During the course of your relationship with Wheels Up, you may receive or become privy to material, nonpublic information about Wheels Up, or its Business Partners. Material information includes information that could be important for an investor to consider in making a decision about whether to buy or sell securities. Federal, state or local securities law prohibits you from using such material, nonpublic information to purchase, sell, gift or otherwise trade in the Company's securities or provide any such information to others outside of Wheels Up. The penalties for trading on material, nonpublic information can be severe, both for individuals involved in such unlawful conduct and their employers and supervisors, and may include jail terms, criminal fines, civil penalties and civil enforcement injunctions. Our Insider Trading Policy has important information and details regarding these restrictions on trading, including information on related company-wide trading windows and blackout periods.

79.    In a section titled, "Reporting a Violation," the Code of Conduct states the following, in relevant part:

Any actual or suspected violations of the Code should be reported immediately to your manager, the Human Resources Department, the Legal Department and/or Wheels Up's hotline (set forth in Wheels Up's Whistleblower Policy), without fear of any form of retaliation.

80.    In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

Wheels Up's business dealings must never be influenced by, or appear to be influenced by, its Personnel's personal interests. Therefore, upon hire, each year, and whenever a potential conflict of interest arises, employees are required to disclose all interests, relationships or activities which may present a conflict of interest between Wheels Up and the Personnel.

A conflict of interest may exist and should be disclosed where these interests, relationships or activities may directly or indirectly compete or interfere with the business, business opportunities or business relationships (including vendor, supplier, member, client, and employee relationships) of Wheels Up. Conflicts of interest may arise when any Personnel or a member of her or his family or friends receives improper personal benefits as a result of her or his position with Wheels Up. Loans to, or guarantees of obligations of any Personnel and their family members or friends are generally not permitted due to legal concerns and because they may create conflicts of interest.

81.    In a section titled, "Wheels Up Records, Financial and Tax Integrity," the Code of Conduct states:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings releases, financial reports and disclosures to our shareholders and lenders, and guide our business decision-making and strategic planning. Wheels Up records include sales information, payroll, travel and expense reports, e-mails, accounting, tax and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business.

All Wheels Up records must be complete, accurate and reliable in all material respects. Wheels Up policy is to comply with utmost best practice in maintaining complete and accurate financial books, financial and tax records and statements related to its business in accordance with applicable laws, regulations and recognized industry practices. Wheels Up ensures transparency in all its financial and tax dealings and has adequate internal controls in place. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy and to report to your manager, the Legal Department or through the Whistleblower policy any breach or suspected breach of this policy that you may become aware of Ask your manager if you have any questions.

82.     In a section titled, "Additional Expectations of Wheels Up Leaders," the Code of Conduct outlines "additional responsibilities" of "Wheels Up leaders" that include "[c]reat[ing] a culture of compliance and ensur[ing] that business results are never treated as being more important than acting legally and ethically" and "demonstrat[ing] the highest standards of integrity — set the right example, and others will follow your lead."

83.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## WHEELS UP'S AUDIT COMMITTEE CHARTER

84.     The Company also maintains a Charter of the Audit Committee of the Board of Directors of Wheels Up Experience Inc. (the "Audit Committee Charter") which outlines the responsibilities and obligations of the Audit Committee. The Audit Committee Charter states that:

> The purpose of the Committee is to assist in the Board's oversight of: (i) the adequacy and integrity of the Company's accounting and financial reporting processes and procedures; (ii) the integrity of the Company's financial statements; (iii) the Company's compliance with legal and regulatory requirements and the Company's enterprise risk management program; (iv) the independent auditor's appointment, qualifications, independence, work and retention; (v) the scope, approach, performance and results of the independent auditors and the Company's internal audit function; and, (vi) to prepare the Committee's report required by the SEC to be included in the Company's annual proxy statement.

85.     In a section titled, "Annual Financial Statements and Annual Audit," the Audit Committee Charter states that "[t]he Committee shall meet with management, the internal auditor (if any) and the independent auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit."

86.     In the same section, the Audit Committee Charter states that the Audit Committee "shall review and discuss with management and the independent auditor any material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities of which the Committee is made aware that do not appear on the financial statements of the Company and that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses."

87.     On the topic of "Quarterly Financial Statements," the Audit Committee Charter states that the Audit Committee "shall review and discuss the quarterly financial statements with management, the internal auditor (if any) and the independent auditor."

88.     Finally, with respect to "Other Powers and Responsibilities," the Audit Committee Charter provides that the Audit Committee shall, in relevant part:

- Discuss with management and the independent auditor the Company's earnings press release (with particular focus on any "pro forma" or "adjusted" nonGAAP financial information), as well as financial information and earnings guidance provided to analysts and ratings agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

- Shall review and approve all related-party transactions that would be required to be disclosed under Items 404(a) and 404(b) of SEC Regulation S-K and to the extent otherwise material.

- In addition to its review of the Company's annual and quarterly financial statements, the Committee shall review and discuss any relevant financial reports or other financial information submitted by the Company to any governmental body or the public, including earnings press releases and/or guidance, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP financial information. Such discussions may be in general terms.

- The Committee shall approve the appointment, replacement, reassignment, and dismissal of the Company's Chief Financial Officer.

- The Committee shall discuss with management and the independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

- The Committee shall discuss with management policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the Company's major financial risk exposures and the steps management has undertaken to control them.

- The Committee shall discuss with the Company's General Counsel or outside counsel any significant legal, compliance or regulatory matters that could reasonably be expected to have a material impact on the Company's financial statements or compliance policies, including violations of the Company's Code of Business Conduct and Ethics.

- The Committee shall discuss any disclosures made to the Committee by the Company's Chief Executive Officer or Chief Financial Officer during their certification process for the Form 10-K and the Form 10-Q regarding: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any material weakness in internal controls identified to the independent auditor; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

- The Committee, through its Chair, shall report regularly to the Board, and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

89. In violation of the Audit Committee Charter, Defendants Radecki, Farrell, and Cheung failed to adequately review and discuss the Company's quarterly financial statements and press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT

#### Relevant Background

90. Wheels Up, founded in 2013, is a Delaware corporation, based in New York, New York, that provides on-demand private aviation services throughout the United States. The Company offers membership programs, charter, aircraft management services, and aircraft sales. Wheels Up also offers freight, safety, and security solutions and management services to private individuals, industry, civil, and government entities.

91.     Wheels Up entered a strategic partnership with Delta in January 2020, which contemplates a close relationship between the companies, including the sharing of an annual joint marketing and communications plan that "focuses on mutual revenue and brand goals, influence/ambassador partnerships and co-branded event opportunities," among other things. The Wheels Up-Delta partnership further requires Wheels Up to purchase miles in Delta's SkyMiles Program, allows Wheels Up to purchase flight tickets at discounted rates from Delta, and encourages Delta to furnish certain Wheels Up executives and employees with Delta 360 and SkyMiles Medallion benefits.

92.     To this end, Delta is the largest shareholder of Wheels Up, owning 20.7 percent of the total outstanding stock of the Company as of April 13, 2023.

93.     On July 13, 2021, Wheels Up completed a reverse merger with Aspirational, a blank check company or special purpose acquisition company ("SPAC"), whereby Wheels Up became a publicly traded company on the NYSE.

94.     Throughout the Relevant Period, Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company in its public disclosures and SEC filings. In particular, Defendants failed to disclose adverse information regarding the Company's business prospects and operations. These inadequate internal controls resulted in the Company's failure to comply with SEC rules and regulations, delayed the filing of several financial statements with the SEC, and eventually forced the Company to restate several financial statements filed with the SEC.

95.     Additionally, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the adequacy of the

Company's internal controls over financial reporting. The Individual Defendants willfully or recklessly made and/or caused the Company to issue the false and misleading statements that failed to disclose, *inter alia*, that: (1) certain financial statements were improperly reported and would need to be restated; (2) the Company's internal controls were inadequate; (3) the Company disregarded its internal controls shortcomings; (4) as a result, the Company's annual filings would be delayed in violation of NYSE listing requirements; (5) after the misconduct concluded, the Company's CEO and Chairman of the Board would leave his roles; (6) as a result of the foregoing, the Company's public statements were false and misleading at all relevant times.

**False and Misleading Statements**

*November 9, 2022 Press Release*

96.     On November 9, 2022, after the market closed, Wheels Up issued a press release entitled, "Wheels Up Announces Record Third Quarter Revenue Up 39% Year-over-Year." The press release announced the Company's Q3 2022 financial results, ending for the period on September 30, 2022. The press release was accompanied by the Company's filing of a Form 8-K with the SEC. The Company reported a net loss of $86,838,000 for the three months ended September 30, 2022, and a net loss of $268,637,000 for the nine months ended September 30, 2022. Wheels Up further reported goodwill of $52,847,000 and an accumulated deficit of $988,964,000 for the period ended September 30, 2022.

*November 9, 2022 Form 10-Q*

97.     On the same day, November 9, 2022, Wheels Up filed its Q3 2022 10-Q with the SEC. Attached to the Q3 2022 10-Q were SOX certifications signed by Defendants Dichter and Smith attesting to the accuracy of the Q3 2022 10-Q.

98.     The Q3 2022 10-Q reported the same net loss, goodwill, and accumulated deficit data as the press release and Form 8-K that were issued the same day. The Q3 2022 10-Q also did not identify any material weaknesses in Wheels Up's internal controls and procedures. In relevant part, the Company stated the following:

**ITEM 4. CONTROLS AND PROCEDURES**

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective at a reasonable assurance level.

Changes in Internal Control over Financial Reporting

[T]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2022, which were identified in connection with management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***March 9, 2023 Press Release***

99.     On March 9, 2023, before the market opened, Wheels Up issued a press release entitled, "Wheels Up Announces Record Revenue for Fourth Quarter 2022." The press release announced the Company's Q4 2022 financial results, ending for the period on December 31, 2022. The press release was accompanied by the Company's filing of a Form 8-K with the SEC. The Company reported a net loss of $238,910,000 for the three months ended December 31, 2022, and a net loss of $507,547,000 for the twelve months ended December 31, 2022. Wheels Up further reported goodwill of $396,118,000 and an impairment of goodwill of $132,000,000 for the period ended December 31, 2022.

100. The statements in ¶¶ 96-99 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) certain financial statements were improperly reported and would need to be restated; (2) the Company's internal controls were inadequate; (3) the Company disregarded its internal controls shortcomings; (4) as a result, the Company's annual filings would be delayed in violation of NYSE listing requirements; (5) after the misconduct concluded, the Company's CEO and Chairman of the Board would leave his roles; and (6) as a result of the foregoing, the Company's public statements were false and misleading at all relevant times.

### The Truth Emerges

#### *March 17, 2023 Notification of Late Filing*

101. On March 17, 2023, after the market closed, Wheels Up issued a Notification of Late Filing on Form 12b-25 which stated that the Company would be unable to timely file its 2022 10-K with the SEC due to "unanticipated delays in compiling certain necessary information," stating in relevant part:

> The Company experienced unanticipated delays in compiling certain necessary information to complete its audited financial statements and prepare a complete filing of its Annual Report in a timely manner without unreasonable effort or expense.

> The Company anticipates that the Annual Report will be filed as soon as practicable and prior to the fifteenth calendar day following the prescribed due date.

102. On this news, the price per share of the Company's common stock fell $0.027, or 3.28%, from a closing price of $0.824 per share on March 17, 2023, to a closing price of $0.7970 per share on March 20, 2023, the next trading day. However, investors did not yet know about the true state of the Company.

*March 31, 2023 Form 8-K*

103.    On March 31, 2023, the truth fully emerged when the Company filed the March

2023 8-K with the SEC that revealed Wheels Up had "a material weakness" in its internal controls

over financial reporting. The March 2023 8-K also revealed that several of the Company's

previously filed financial statements should no longer be relied upon and further announced a

plan to address the material weaknesses in the Company's internal controls. Specifically, Wheels

Up stated in the March 2023 8-K that a $62.0 million goodwill impairment charge should have

been recognized for Q3 2022, a $118.0 million goodwill impairment charged should have been

recognized for Q4 2022, and a $180 million goodwill impairment charge should have been

recognized for Fiscal Year 2022.

104.    The March 2023 8-K stated, in relevant part:

Item 2.02 Results of Operations and Financial Condition.

The Company is filing this Amendment No. 1 to the Original Filings to reflect
adjustments to the presentation of the Company's unaudited financial statements
and reconciliations of Net loss to Adjusted EBITDA, in each case contained in the
Original 3Q Press Release and the Original 4Q Press Release and incorporated by
reference into the Original 3Q Filing and the Original 4Q Filing, respectively. In
connection with the preparation of the audited financial statements to be included
in the Annual Report on Form 10-K, the Company determined that non-cash
goodwill impairment charges of (i) $62.0 million should have been recognized by
the Company during the three months ended September 30, 2022, based on the
Company's reassessment of the fair value of the legacy Wheels Up reporting unit
(excluding Air Partner) ("WUP Legacy") as of September 30, 2022, and (ii) $118.0
million should have been recognized by the Company during the three months
ended December 31, 2022 [and $180 million for the twelve months ended
December 31, 2022], based on the assessment of the fair value of WUP Legacy as
of December 31, 2022, in each case that were necessary to reflect the diminished
fair value of WUP Legacy as of the applicable measurement dates.

The recognition of non-cash goodwill impairment charges of $62.0 million for the
three months ended September 30, 2022 and $118.0 million for the three months
ended December 31, 2022 resulted in the following changes to the Company's
unaudited condensed consolidated financial statements set forth in the Original
Press Releases:

• For the three and nine months ended September 30, 2022, the Company recognized a charge for "Impairment of goodwill" of $62.0 million in the Company's unaudited condensed consolidated statements of operations, which resulted in:

> o a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;

> o a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per share, for the nine months ended September 30, 2022; and

> o corresponding adjustments, and associated impacts of the adjustments, to:

>> - the balances of the "Goodwill" [of $459,847,000] and "Accumulated deficit" [of $1,050,964,000] line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;

>> - the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and

>> - the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the Company's reconciliations of Net loss to Adjusted EBITDA for the three and nine months ended September 30, 2022.

• For the three months ended December 31, 2022, the Company decreased the charge for "Impairment of goodwill" by $14.0 million in the Company's unaudited condensed consolidated statements of operations versus what was reported in the Original 4Q Press Release, which resulted in:

> o a $14.0 million decrease to the Company's Net loss for the three months ended December 31, 2022 and, taking into account the impact of the non-cash goodwill impairment charge for the three months ended September 30, 2022, a $48 million increase to the Company's Net loss for the year ended December 31, 2022, in each case versus the previously reported financial results;

> o a revised Net loss of $224.9 million, or $0.91 per share, for the three months ended December 31, 2022, and $555.5 million, or $2.26 per share, for the year ended December 31, 2022; and

o corresponding adjustments, and associated impacts of the adjustments, the following items, in each case in the same manner described with respect to the "Impairment of goodwill" charge recognized during the three and nine months ended September 30, 2022 above:

- the Company's unaudited condensed consolidated balance sheets as of December 31, 2022;

- the unaudited condensed consolidated statements of cash flows for the year ended December 31, 2022; and

- the reconciliations of Net loss to Adjusted EBITDA for the three months and year ended December 31, 2022.

• The adjustments did not impact the Company's Adjusted EBITDA results for the three and nine months ended September 30, 2022 or the three months and year ended December 31, 2022.

Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

**(a)** On March 27, 2023, the Company, on the recommendation of the Audit Committee of the Company's Board of Directors, concluded that the Prior Financial Statements should no longer be relied upon. This determination resulted from the identification of an error in the Prior Financial Statements, which resulted in a non-cash goodwill impairment charge related to WUP Legacy for the three months ended September 30, 2022 that is described in Item 2.02 of this Amendment No. 1.

**(b)** The Company has assessed the materiality of this error in accordance with applicable SEC rules, and has concluded that the Prior Financial Statements should be restated. The Company intends to include the restated Prior Financial Statements in an amended Quarterly Report on Form 10-Q/A (the "Amended Quarterly Report") to be imminently filed with the SEC. As a result of the restatement of the Prior Financial Statements and the Amended Quarterly Report, management has determined that a material weakness existed in the Company's internal control over financial reporting related to the financial statement close process for the three months ended September 30, 2022.

### *March 31, 2023 Restatement*

105. That same day, Wheels Up filed the Restatement with the SEC, which included

signed SOX certifications from Defendants Dichter and Smith attesting to the accuracy of the

Restatement. The Restatement admitted that Wheels Up's internal controls and procedures were not effective for the periods ending Q3 2022 and Q4 2022.

106.    The Restatement reported the same data as the March 2023 8-K and addressed Wheels Up's internal control failures, stating the following, in relevant part:

ITEM 4. CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Form 10-Q/A.

At the time of the Original 10-Q Filing, management, including our Chief Executive Officer and Chief Financial Officer, initially concluded that our disclosure controls and procedures were effective as of September 30, 2022. As a result of the restatement of the Company's financial statements and the material weakness identified below, management has reconsidered its assessment and now concludes that we did not maintain effective disclosure controls and procedures.

Management's Report on Internal Control over Financial Reporting

In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, management identified a material weakness in certain internal controls over financial reporting related to the financial statement close process. The deficiency resulted in a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022 to recognize a non-cash goodwill impairment charge which should have been recognized during the three months ended September 30, 2022, which resulted in the understatement of Net loss for the three and nine months ended September 30, 2022. The Company filed a Quarterly Report on Form 10-Q/A with the SEC on March 31, 2023 to restate the unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022. The Company's remediation plan will be described in the Company's Annual Report on Form 10-K for the year ended December 31, 2022.

107.    On the same day, March 31, 2023, Wheels Up filed its belated 2022 10-K with the SEC, which included signed SOX certifications from Defendants Dichter and Smith attesting to the accuracy of the 2022 10-K. The 2022 10-K contained similar representations as the

Restatement, revealing that Wheels Up's internal controls and procedures were not effective for the periods ending Q3 2022 and Q4 2022.

108.   The 2022 10-K also addressed Wheels Up's internal control failures, stating the following, in relevant part:

ITEM 9A. CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the period covered by this Annual Report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2022 due to material weaknesses in our internal control over financial reporting described below. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the consolidated financial statements for the periods covered by and included in this Annual Report fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with generally accepted accounting principles in the United States of America ("GAAP").

Management's Annual Report on Internal Control over Financial Reporting

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the criteria described in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management, including the Company's Chief Executive Officer and Chief Financial Officer, concluded that our internal control over financial reporting was not effective as of December 31, 2022 due to control deficiencies that, when aggregated, resulted in the material weaknesses described below, which are defined as a deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

We did not maintain effective controls over information technology ("IT") for IT systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, we identified deficiencies in (i) user access controls to ensure appropriate segregation of duties, (ii) controls that restrict user

access to financial applications, programs and data affecting underlying accounting records, and (iii) program change management controls affecting IT applications and underlying accounting records, that ensure IT program and data changes are identified, tested, authorized and implemented properly. None of the IT deficiencies resulted in a material misstatement to our annual or interim consolidated financial statements for the year ended December 31, 2022.

We did not maintain effective controls over the financial statement close and key business processes. Specifically, we did not consistently execute on our established accounting policies and procedures, and did not design, document and maintain controls to achieve complete, accurate and timely financial accounting, reporting and disclosures in accordance with GAAP. These include controls over account reconciliations, segregation of duties, review of journal entries and review of complex accounting matters. This deficiency resulted in a restatement of our unaudited condensed consolidated financial statements for the quarter and year-to-date period ended September 30, 2022.

109.    On this news, the price per share of Wheels Up stock fell 11.37%, or $0.072 per share, from the previous day's closing price of $0.633, closing at $0.5610 on April 3, 2023, the next trading day.

## DAMAGES TO WHEELS UP

110.    As a direct and proximate result of the Individual Defendants' conduct, Wheels Up has lost and will continue to lose and expend many millions of dollars.

111.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, the cost of legal fees and possible judgment against the Company in the Securities Class Action, the cost of any internal investigations conducted by the Company, the cost of implementing adequate internal controls, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

112.    As a direct and proximate result of the Individual Defendants' conduct, Wheels Up has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

113.    Plaintiff brings this action derivatively and for the benefit of Wheels Up to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Wheels Up, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

114.    Wheels Up is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiff is, and has been at all relevant times, a shareholder of Wheels Up. Plaintiff will adequately and fairly represent the interests of Wheels Up in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

117.    A pre-suit demand on the Board of Wheels Up is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Dichter, Adelman, Armstrong, Cheung, Farrell, James, Radecki, Schuman, Snell, and Thakran (the "Director Defendants"), and non-parties Admiral Mike Mullen and Dan Janki (together with the Direct Defendants, the "Directors"). Plaintiff needs only to allege demand

futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

118.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

119.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

120.    Additional reasons that demand on Defendant Dichter is futile follow. Defendant Dichter is the founder of the Company, having also served as the Company's CEO and Chairman of the Board from 2013 to May 2023. Thus, as the Company admits, he is a non-independent director. In addition, he signed the Q3 2022 10-Q, which contained false and misleading elements that benefitted the other Individual Defendants. As the Company's trusted former highest officer and Board Chairman, Defendant Dichter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. Moreover, Defendant Dichter is a defendant in the Securities Class Action. For these reasons, Defendant Dichter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Adelman is futile follow. Defendant Adelman has served as a Company director since October 2013. He also serves as the chair of the Compensation Committee and as a member of the Nominating and ESG Committee. Defendant Adelman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Adelman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Armstrong is futile follow. Defendant Armstrong has served as a Company director since April 2019. He also serves as a member of the Compensation Committee. Defendant Armstrong has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Armstrong breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.   Additional reasons that demand on Defendant Cheung is futile follow. Defendant Cheung has served as a Company director since April 2016. Defendant Cheung also serves as a member of the Audit Committee. Additionally, Defendant Cheung has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cheung breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.   Additional reasons that demand on Defendant Farrell is futile follow. Defendant Farrell has served as a Company director since July 2021. Defendant Farrell also serves as a member of the Audit Committee. Additionally, Defendant Farrell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Farrell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.     Additional reasons that demand on Defendant James is futile follow. Defendant James has served as a Company director since February 2022 and currently works as Delta's Senior Vice President—Customer Engagement and Loyalty. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant James breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.     Additional reasons that demand on Defendant Radecki is futile follow. Defendant Radecki has served as a Company director since January 2017. He also serves as Chair of the Audit Committee. Additionally, Defendant Radecki has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Radecki breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.     Additional reasons that demand on Defendant Schuman is futile follow. Defendant Schuman has served as a Company director since July 2021. She also serves as a member of the Compensation Committee and as a member of the Nominating and ESG Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Schuman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Snell is futile follow. Defendant Snell has served as a Company director since November 2020 and currently works as Delta's Senior Vice President—Airport Customer Service, Cargo Ops, Global Clean and GSE. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Snell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Thakran is futile follow. Defendant Thakran has served as a Company director since July 2021. Additionally, Defendant Thakran has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Thakran breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on the Board is futile follow.

131.    The history of business between Wheels Up and Delta renders Defendant Dichter, Defendant Snell, Defendant James, and non-party Janki unable to disinterestedly and independently consider commencing litigation against themselves and the other Individual Defendants that provide Wheels Up with additional business and integral financing.

132.    Additionally, the Company is party to various commercial arrangements with Delta, whose CFO is non-party Janki, who serves as the Company's Chairman of the Board. Additionally, both Defendants James and Snell hold management positions at Delta. On January 17, 2020, Wheels Up acquired several private jets from Delta's private jet fleet in exchange for Class E shares of Wheels Up, which constituted 26.1% of the total outstanding equity of Wheels Up at the time. From that original agreement, Wheels Up and Delta have penned several agreements that constitute Wheels Up's strategic partnership with Delta. The Commercial Cooperation Agreement ("CCA") provides that the two companies will "work together each year to develop annual joint marketing and a communications plan that focuses on mutual revenue and brand goals, influence/ambassador partnerships and co-branded event opportunities." The CCA further requires that "Wheels Up will provide certain in-kind benefits to Delta, measured on an annual basis."

133.    Another agreement, the Program Participation Agreement ("PPA"), requires that Wheels Up "purchases miles in the SkyMiles Program from Delta." Moreover, the PPA prohibits Delta from entering "into a marketing or enhanced benefits agreement or relationship with certain other commercial air carriers."

134.    Non-party Janki is the CFO of Delta, Defendant Snell is Delta's Senior Vice President—Airport Customer Service, Cargo Ops, Global Clean and GSE, and Defendant James

is Delta's Senior Vice President—Customer Engagement and Loyalty. Non-party Janki, Defendant Snell, and Defendant James all serve as directors of Wheels Up. Wheels Up has done substantial business with Delta, making non-party Janki and Defendants Snell and James parties to numerous related transactions. Because taking action against Wheels Up and the Individual Defendants would potentially harm Delta (and through Delta, non-party Janki and Defendants James and Snell) financially, non-party Janki and Defendants Snell and James are unable to disinterestedly and independently consider commencing litigation against themselves and the other Individual Defendants.

135.    Moreover, Defendant Radecki served as Chair and Defendants Cheung and Farrell served as members of the Audit Committee during the Relevant Period (the "Audit Committee Defendants"). In violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately review and discuss the Company's Q3 2022 10-Q and press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

136.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure

the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

137.     Wheels Up has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Wheels Up any part of the damages Wheels Up suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

138.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

139.     The acts complained of herein constitute violations of fiduciary duties owed by Wheels Up's officers and directors, and these acts are incapable of ratification.

140.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Wheels Up. If there is a directors' and

officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Wheels Up, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile and, therefore, excused.

141.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Wheels Up to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event as well.

142.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wheels Up's business and affairs.

145.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

146.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wheels Up.

147.   In breach of their fiduciary duties owed to Wheels Up, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) certain financial statements were improperly reported and would need to be restated; (2) the Company's internal controls were inadequate; (3) the Company disregarded its internal controls shortcomings; (4) as a result, the Company's annual filings would be delayed in violation of NYSE listing requirements; (5) after the misconduct concluded, the Company's CEO and Chairman of the Board would leave his roles; and (6)  as a result of the foregoing, the Company's public statements were false and misleading at all relevant times.

148.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

149.   The Individual Defendants further breached their fiduciary duties while one of them engaged in lucrative insider sales in excess of $280,000 while the Company's common stock was trading at artificially inflated prices due to the Individual Defendants' breaches of their fiduciary duties.

150.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

151.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Wheels Up's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

152.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wheels Up has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154.    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wheels Up.

157.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Wheels Up that was tied to the performance or artificially inflated valuation of Wheels Up, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

158.    Plaintiff, as a shareholder and a representative of Wheels Up, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

159.    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Abuse of Control**

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Wheels Up, for which they are legally responsible.

162.    As a direct and proximate result of the Individual Defendants' abuse of control, Wheels Up has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Wheels Up has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Wheels Up in a manner consistent with the operations of a publicly-held corporation.

166.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Wheels Up has sustained and will continue to sustain significant damages.

167.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

171.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Wheels Up to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

172.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173.    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Dichter and Smith for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Wheels Up, Defendant Dichter, and Defendant Smith are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dichter's and Smith's willful and/or reckless violations of their obligations as officers and/or directors of Wheels Up.

176.    Defendants Dichter and Smith, because of their positions of control and authority as officers and/or directors of Wheels Up, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Wheels Up, including the wrongful acts complained of herein and in the Securities Class Action.

177.    Accordingly, Defendants Dichter and Smith are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15

U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

178.    As such, Wheels Up is entitled to receive all appropriate contribution or indemnification from Defendants Dichter and Smith.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Wheels Up, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wheels Up;

(c)     Determining and awarding to Wheels Up the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Wheels Up and the Individual Defendants to take all necessary actions to reform and improve Wheels Up's corporate governance and internal procedures to comply with applicable laws and to protect Wheels Up and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Wheels Up to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Wheels Up restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 12, 2023

**THE BROWN LAW FIRM, P.C.**

*/s/    Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
      eitank@bgandg.com

*Counsel for Plaintiff*

## **VERIFICATION**

   I, Philip Irminger, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

   I declare under penalty of perjury that the foregoing is true and correct.  Executed this
12 ___ day of September, 2023.

DocuSigned by:

*Philip Irminger*

22B2488693A3D45F...

Philip Irminger